EASTMAN & MCCARTNEY LLP
Mathew C. McCartney (SBN 226687)
N. Thomas McCartney* (SBN 066758)
1430 Truxtun Avenue, Suite 700
Bakersfield, California 93301
Telephone: (661) 334-1800
Facsimile: (661) 334-8016
*of counsel
Email: matt@eastmanmccartney.com

ANDREW S. DALLMANN, P.C.
Andrew S. Dallmann (SBN 206771)
1201 Puerta del Sol, #325
San Clemente, California 92673
Telephone: (949) 218-4099
Facsimile: (949) 218-4099
E-mail: andrew@dallmannlaw.com

Attorneys for Plaintiffs, H & M Gopher Control and Allen Hurlburt

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| H & M GOPHER CONTROL, a California general partnership, ALLEN HURLBURT, an individual<br><br>Plaintiffs,<br><br>vs.<br><br>BENCHMARK PEST CONTROL, INC, a California corporation; ANDREW OZANICH, an individual,<br><br>Defendants. | COMPLAINT FOR:<br>(1) INFRINGEMENT OF U.S. PATENT NO. 8,840,349;<br>(2) TRADEMARK INFRINGEMENT IN VIOLATION OF 15 U.S.C. § 1114(1);<br>(3) UNFAIR COMPETITION, AND FALSE DESIGNATION OF ORIGIN, IN VIOLATION OF 15 U.S.C. § 1125(a);<br>(4) COMMON LAW TRADEMARK INFRINGEMENT; AND<br>(5) UNFAIR COMPETITION PURSUANT TO CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17200<br><br>DEMAND FOR JURY TRIAL |

Plaintiffs H & M Gopher Control and Allen Hurlburt bring this action against defendants Benchmark Pest Control, Inc., a California corporation, and Andrew Ozanich, an individual.

## THE PARTIES

1.      Plaintiff H & M Gopher Control ("H&M") is a California general partnership with its principal place of business in the county of Modoc, California.

2.      H&M is a leader in the field of portable pressurized exhaust gas dispensers for use in the control of rodents.

3.      Plaintiff Allen Hurlburt ("Hurlburt") is an individual residing in the county of Modoc, California and is a general partner and chief executive officer in H&M along with his wife Virginia Massey, also a general partner and chief financial officer.

4.      Defendant Benchmark Pest Control, Inc. ("Benchmark") is a corporation organized under the laws of the State of California with a principal place of business in Bakersfield, California.

5.      Defendant Andrew Ozanich ("Ozanich") is an individual residing in the county of Kern, California and is, and at all times herein mentioned was, in control of defendant Benchmark Pest Control, Inc.

## JURISDICTION AND VENUE

6.      This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 271 and for infringement of federally-registered trademarks in violation of Section 32(1) of the Lanham Act (15 U.S.C. §1125(a)).

7.      This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a)-(b) because it involves substantial claims arising under the patent laws and under the Lanham Act.

8.      This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

9.      This Court has personal jurisdiction over defendants because defendants reside within, and regularly conduct business within, and specifically direct their business activities to, the State of California and the Eastern District of California ("this District").  Defendants have

purposefully availed themselves of the opportunity to conduct business in the State of California through systematic and continuous dealings in the State of California.

10.     Venue is proper in the Eastern District of California under 28 U.S.C. §§ 1391(b)-(c) because a substantial part of the events giving rise to the claims pled herein occurred in this District.  Venue also is proper under U.S.C. § 1400(b) because defendants have committed, induced others to commit, or contributed to others committing, acts of infringement in this District.

## BACKGROUND

11.     On September 1, 2009, the United States Patent and Trademark Office issued United States Patent Number 7,581,349, titled "Method and Apparatus for using Pressurized Exhaust Gases to Control Rodents" (hereinafter the "'349 Patent.").  A true and correct copy of the '349 patent is provided as Exhibit 1.

12.     Hurlburt is the owner and sole inventor of the '349 Patent and is the chief executive officer of H&M.

13.     The '349 Patent pertains to devices and methods for controlling rodents using pressurized exhaust gases from an internal combustion engine.  The gasses are compressed and injected under pressure into underground burrows of rodents.  The rodent tunnels fill with a very high concentration of injected exhaust gases, including carbon monoxide, within just a few seconds, quickly overwhelming and exterminating all rodents within the rodent tunnels.

14.     In 2005, Hurlburt developed the tradename H & M GOPHER CONTROL and the trademark PERC.  Hurlburt authorized his business H&M to act as an exclusive licensee to use the tradename H & M GOPHER CONTROL in connection with its business activities and the trademark PERC in connection with the gopher control systems sold by H&M and protected by the '349 Patent.

15.     Since, at least, as early as 2006, Hurlburt caused H&M to utilize the tradename H & M GOPHER CONTROL exclusively in connection with its business operations.  Since at least as early as 2007, Hurlburt also caused H&M to utilize the trademark PERC in connection

with exhaust gas systems for rodent control designed by Hurlburt and sold by H&M and protected by the '349 Patent.

16.     Since at least 2007, H&M has continuously used, at the direction of Hurlburt, the tradename H & M GOPHER CONTROL and the trademark PERC in interstate commerce in connection with unique exhaust gas systems for rodent control designed by Hurlburt and sold by H&M and protected by '349 Patent.

17.     Since 2007, H&M has been continuously advertising and selling unique exhaust gas systems for rodent control under and in connection with the tradename H & M GOPHER CONTROL and trademark PERC to consumers throughout the United States and has sold units throughout the United States.

18.     Since 2007, H&M has grown to be a reputable and well-respected organization providing unique exhaust gas systems for rodent control and Hurlburt has become well known in his industry for his unique exhaust gas systems for rodent control which has proved to be extremely effective in rodent control.

19.     Since 2007, the H & M GOPHER CONTROL tradename and PERC trademark have been prominently featured in H&M's advertising and promotional materials.

20.     H&M and Hurlburt have both received media acclaim and recognition for Hurlburt's unique exhaust gas systems for rodent control and H&M's gopher control product line.

21.     Because of H&M's authorized longstanding exclusive use and extensive advertising and promotion of the H & M GOPHER CONTROL tradename and PERC trademark, the tradename and trademark have come to be and are now recognized and relied upon by the trade and public as identifying the goods of H&M and distinguishing them from others.

22.     In addition to its longstanding common law rights in the H & M GOPHER CONTROL tradename, more fully discussed hereinafter, and PERC trademark, Hurlburt owns United States trademark registration number 4097962 for the tradename H & M GOPHER CONTROL and United States trademark registration number 4086472 for the trademark PERC.

Both registrations have become incontestable under the provisions of 15 U.S.C. § 1065.  Both trademarks are valid and subsisting and neither registration has ever been cancelled.

23.     A true and correct copy of United States trademark registration number 4097962 for H & M GOPHER CONTROL is attached hereto as Exhibit 2.  At all times herein mentioned, H&M has been and continues to be the exclusive licensee to utilize the H & M GOPHER CONTROL tradename and trademark.

24.     A true and correct copy of United States trademark registration number 4086472 for PERC is attached hereto as Exhibit 3. At all times herein mentioned, H&M has been and continues to be the exclusive licensee authorized to utilize the PERC trademark.

25.     As the exclusive licensee for the trademarks set forth herein, H&M is empowered by virtue of its license agreement with Hurlburt to bring this suit in its own name.

26.     H&M is also the exclusive licensee of the '349 Patent and is empowered by virtue of a license agreement with Hurlburt to bring this suit in its own name pursuant to 35 U.S.C. § 207(a)(2), to settle claims or suits for infringement, and to grant sublicenses to the '349 Patent.

27.     H&M sells various exhaust gas systems for rodent control that are protected by one or more claims of the '349 Patent, including model numbers RC 412TNAX and RC 412RT. The differences between the two models pertain to the undercarriage design and those differences are unrelated to the features claimed in the '349 Patent.  All models sold by H&M, including model number RC 412TNAX and RC 412RT feature the H & M GOPHER CONTROL tradename and PERC trademark.

28.     All 412 units sold by H&M have a logo bearing both the H & M GOPHER CONTROL tradename and the PERC trademark.  A true and correct copy of this logo is attached hereto as Exhibit 4.  In addition, all 412 units sold by H&M are equipped with a belt guard with the PERC trademark permanently formed therein.

29.     On or about November of 2015, Ozanich contacted Hurlburt to inform him that Ozanich wanted to purchase a model RC 412RT and H&M provided a quote to Ozanich for the requested unit.  Shortly thereafter, Ozanich placed an order for a model RC 412RT from H&M based on the quote.

30.     By December of 2015, H&M informed Ozanich that his ordered model RC 412RT was ready for pickup. Ozanich claimed he could not pick up the unit until the following year. Later that month Ozanich cancelled the order and the unit was sold to another H&M customer.

31.     In July 2016, Ozanich contacted Hurlburt and informed Hurlburt that Ozanich has purchased a used model number RC 412TNAX from a third party.  Ozanich provided to Hurlburt the serial number for the used unit Ozanich claimed to have purchased.  Hurlburt used the serial number to verify the unit as originating from H&M in April of 2016. Ozanich informed Hurlburt that the unit was in bad condition and needed some repairs and that the trailer needed to be rebuilt.

32.     Beginning in July 2016 and continuing through August 2016, Ozanich made three separate orders for parts used in the 412 model lineup, including model RC 412TNAX and model RC 412RT.  Ozanich informed H&M that some parts in the unit he purchased had failed and that he wanted to stock up on additional parts.  Such requests and purchases are common by H&M customers and H&M regularly sells parts to its customers.

33.     In July of 2017, Ozanich contacted Hurlburt and requested to buy all of the parts necessary to build a 412 unit himself.  Hurlburt informed Ozanich that H&M would not sell all the parts to make a 412 unit and if Ozanich wanted a second 412 unit he needed to buy one. Ozanich then requested a quote for a RC 412SKID unit, which includes the patented apparatus but not a rolling undercarriage.  H&M provided the quote to Ozanich, but Ozanich never placed and order and the quote expired.

34.     In August of 2017, H&M partner and chief financial officer, Virginia Massey received a phone call from a former employee of Benchmark named Kimberly Ozanich who informed H&M that Ozanich had manufactured four gopher control trailers that were copied from the H&M design.

35.     In September of 2017, Kimberly Ozanich informed H&M that Ozanich had retained a local printing company to copy the H&M logo and that he had falsely told the owners of the printing company that Ozanich had permission to copy the logos.  Kimberly Ozanich has provided to plaintiffs a photograph of the counterfeit H&M logos.  Kimberly Ozanich further

informed H&M that Ozanich had four units in service and was currently manufacturing four additional units.  Kimberly Ozanich provided photographs of the four units and additional photographs of additional units under construction. Kimberly Ozanich provided a copy of Benchmark invoice 10951 dated October 14, 2016, for services provided by Benchmark to treat gophers using "2 PERC SYSTEMS."

36.     On or about February of 2017, Benchmark uploaded photos of four gopher control systems on its Facebook® page that are nearly identical in configuration to the H&M 412 design.  The photos were placed in an untitled album with the description "Perc Systems! Taking care of Gophers!"  A true and correct copy of the Facebook® page is attached hereto as Exhibit 5.

37.     On October 12, 2017, H&M, through counsel, demanded that Ozanich and Benchmark immediately cease and desist from the unauthorized use of the H&M trademarks and logo on the units that were not manufactured by H&M and further cease and desist from the unauthorized practice of the claims set forth in the '349 Patent.  A true and correct copy of this letter is attached hereto as Exhibit 6.

38.     On October 23, 2017, Ozanich and Benchmark, through counsel, asserted that the '349 Patent is unenforceable and have denied patent infringement based on the modification of certain parts by Ozanich and Benchmark, which modification has no relationship to the scope of any of the claims of the '349 Patent.

39.     Plaintiffs are informed and believe that Ozanich and Benchmark now have seven units in service that practice one or more of the inventions claimed in the '349 Patent and that said seven units each have the PERC trademark and H & M GOPHER CONTROL tradename prominently displayed on them.

40.     Plaintiffs are further informed and believe that Ozanich and Benchmark are continuing to falsely represent to customers and prospective customers that all eight units are PERC systems when in fact Ozanich and Benchmark are only in possession of one PERC system originally manufactured by H&M.

///

## COUNT I
### Patent Infringement of the '349 Patent (35 U.S.C. §§ 101 et seq.)
### (Against all Defendants)

41.     Plaintiffs reallege and incorporate by reference all paragraphs above as if fully set forth herein.

42.     At all times herein mentioned the '349 Patent was and is valid and fully enforceable.

43.     At least three of the four units depicted in the Benchmark Facebook photos identified in Exhibit 5 are nearly identical replicas to the H&M 412 product line and each of those replica units embody and use inventions claimed in the '349 Patent.

44.     Benchmark has and continues to directly infringe the '349 Patent, including claim 1 of the '349 Patent, by making and using at least seven replica model 412 units, at least three of which are shown in the Benchmark Facebook photos identified in Exhibit 5.

45.     Each of the seven replica model 412 units were manufactured by defendants with the knowledge that plaintiffs claimed patent rights in the model 412s under the '349 Patent.

46.     At no time has H&M or Hurlburt granted Ozanich or Benchmark authorization, license, or permission to practice the inventions claimed in the '349 Patent.

47.     H&M and Hurlburt have been damaged by defendants' acts of infringement of the '349 Patent and plaintiffs will continue to be damaged by such infringement unless enjoined by this Court.  Plaintiffs are entitled to recover damages adequate to compensate for the infringement under 35 U.S.C. § 284.

48.     Defendants' acts of direct infringement have been, and continue to be, willful and deliberate and therefore warrant the award of attorney's fees pursuant to 35 U.S.C. § 285 and the enhancement of damages pursuant to 35 U.S.C. § 284.

## COUNT II
### Trademark Infringement (15 U.S.C. § 1114)
### (Against all Defendants)

49.     Plaintiffs reallege and incorporate by reference all paragraphs above as if fully set forth herein.

50.     Long before defendants adopted and used the H & M GOPHER CONTROL tradename and PERC trademark in connection with the seven replica model 412 units, defendants had actual notice and knowledge and constructive notice (pursuant to 15 U.S.C. § 1072) of H&M's commercial use and Hurlburt's ownership of the United States trademark registrations identified herein and the logo used by H&M in connection with the above referenced word marks and set forth in Exhibit 4.

51.     Plaintiffs are informed and believe and based thereon allege that Ozanich and Benchmark have offered rodent abatement services utilizing one or more of the seven replica model 412 units to actual and potential customers of H&M thereby making defendants a direct competitor of H&M.

52.     Plaintiffs are informed and believe and based thereon allege that defendants have copied the exact logo of H&M, which includes the H & M GOPHER CONTROL and PERC marks as well the complete patent number for the '349 Patent.

53.     The adoption of the identical logo of H&M by defendants was done in a deliberate effort to counterfeit plaintiffs' trademarks in order to pass off the replica 412 models as if they originated form H&M.

54.     Defendants' actions are likely to lead the public to conclude, incorrectly, that the defendants' pressurized gopher control systems originated with or are authorized by H&M, which will damage both H&M and the public.

55.     Defendants' unauthorized use of plaintiffs' H & M GOPHER CONTROL tradename and PERC trademark constitutes trademark infringement under 15 U.S.C. § 1114(1) and is likely to cause consumer confusion, mistake or deception.

56.     Plaintiffs are informed and believe and based thereon allege that defendants have advertised and offered rodent abatement services utilizing the PERC trademark with the intention of misleading, deceiving or confusing consumers as to the origin of the pressurized gopher control systems used to perform those rodent abatement services, and with the intention of trading on plaintiffs' reputation and goodwill.

57.     The use of plaintiffs' trademarks in connection with the replica 412 models as set forth herein has had and will continue to have a damaging effect on plaintiffs' interstate business.

58.     Plaintiffs have demanded in writing that defendants cease and desist from their infringing actions, but defendants have denied the infringement and continue to offer gopher abatement services using PERC systems and further utilize unauthorized replica 412 units each bearing the PERC trademark, the H & M GOPHER CONTROL tradename and the H&M logo.

59.     As a direct and proximate result of defendants' trademark infringement, plaintiffs have suffered and will continue to suffer damages in an amount to be proven at the time of trial.

60.     Defendants' acts of trademark infringement will cause further irreparable injury to plaintiffs if defendants are not restrained by this Court from further violation of plaintiffs' rights.

61.     Unless the injunction sought herein is granted, defendants will continue to infringe on plaintiffs' trademarks and cause irreparable injury to plaintiffs from loss of profits and deprivation of the benefit of the goodwill which is attached to plaintiffs' trademarks. Plaintiffs have no adequate remedy at law.

## COUNT III
### Unfair Competition and False Designation of Origin
### (15 U.S.C. § 1125(a))
**(Against all Defendants)**

62.     Plaintiffs reallege and incorporate by reference all paragraphs above as if fully set forth herein.

63.     The acts of defendants in copying the exact logo of H&M, which includes the H & M GOPHER CONTROL and PERC marks as well the complete patent number for the '349 Patent, and in using the copied H&M logo on unauthorized replica 412 units, and in using the PERC mark in connection with offered services to customers, were done deliberately to deceive the consuming public and directly impacts the reputation and goodwill of plaintiffs, built up through more than a decade of interstate sales of model 412 units bearing the aforementioned marks and logo.

64. The defendants' prior and continued use of the H & M GOPHER CONTROL tradename, PERC trademark and H&M logo, in commerce, is likely to cause confusion, mistake, or deception as to the origin, sponsorship, or approval of the defendants' goods or services.

65. Defendants' unauthorized use of the H & M GOPHER CONTROL tradename, PERC trademark and H&M logo constitutes a false designation of origin or false representation that wrongfully and falsely designates defendants' replica 412 units as originating from or connected with H&M, and constitutes the use of false descriptions or representations in interstate commerce.

66. Defendants' actions constitute federal unfair competition and violate 15 U.S.C. § 1125(a).

67. As a direct and proximate result of defendants' unfair competition, plaintiffs have suffered and will continue to suffer loss of income, profits and goodwill and defendant has and will continue to unfairly acquire income, profits and goodwill.

68. Defendants' acts of unfair competition will cause further irreparable injury to plaintiffs if defendants are not restrained by this Court from further violation of plaintiffs' rights. Plaintiffs have no adequate remedy at law.

## COUNT IV
### California common law trademark infringement
### (Against all Defendants)

69. Plaintiffs reallege and incorporate by reference all paragraphs above as if fully set forth herein.

70. Plaintiffs were the first to use the tradename H & M GOPHER CONTROL and the trademark PERC in California in connection with gopher control systems, including the 412 model lineup.

71. As a result of the continued sale of gopher control systems, including the 412 model lineup, under the tradename H & M GOPHER CONTROL and the trademark PERC since 2006, said tradename and trademark have become widely known and plaintiffs have

become identified in the public mind as the manufacturer of the unique pressurized rodent control systems, including the 412 model lineup.

72.     As a result of the long experience, care, and skill of plaintiffs in producing the 412 model lineup under the tradename H & M GOPHER CONTROL and the trademark PERC, plaintiffs have not only become widely known but have also acquired a reputation for excellence.

73.     As a result of that reputation, plaintiffs maintain a significant customer base in the Central Valley and in particular Kern County.

74.     The acts of defendants in copying the exact logo of H&M, which includes the H & M GOPHER CONTROL and PERC marks as well the complete patent number for the '349 Patent, and in using the copied H&M logo on unauthorized replica 412 units, and in using the PERC mark in connection with offered services to customers, were done deliberately to deceive and mislead the consuming public into believing that the replica 412 units were manufactured by plaintiffs, thereby depriving plaintiffs of the benefit of the goodwill attached to plaintiffs' 412 model units.

75.     The defendants' unauthorized use of the H & M GOPHER CONTROL and PERC marks and H&M logo are each likely to cause confusion or mistake or otherwise deceive the consuming public as to the origin of the replica 412 models.

76.     As a direct and proximate result of defendants' trademark infringement, plaintiffs have suffered and will continue to suffer damages in an amount to be proven at the time of trial.

77.     Unless the injunction sought herein is granted, defendants will continue to infringe on plaintiffs' trademarks and cause irreparable injury to plaintiffs from loss of profits and deprivation of the benefit of the goodwill which is attached to plaintiffs' trademarks.

**COUNT V**
**Violation of Cal. Bus. & Profs. Code § 17200**
**(Against all Defendants)**

78.     Plaintiffs reallege and incorporate by reference all paragraphs above as if fully set forth herein.

79.     Defendants' unauthorized use of the replica 412 models that embodies the inventions claimed in the '349 Patent, unauthorized use of the PERC trademark, the H & M GOPHER CONTROL tradename, and the H&M logo is unfair and offends public policy as it is unlawful, unfair, deceptive, unscrupulous, and constitutes a violation of California's Business and Professions Code Section 17200 *et seq.*

80.     Plaintiffs have been damaged by defendants' unlawful, unfair, deceptive, and unscrupulous business acts alleged herein and plaintiffs will continue to be damaged by the same unless enjoined by this Court.

81.     Plaintiffs are entitled to injunctive relief prohibiting defendants from continuing such acts of unfair competition and appropriate restitution remedies under California's Business and Professions Code Section 17203.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for judgment as follows:

a)      For damages resulting from defendants' infringement of the '349 Patent

b)      For a declaration that this patent infringement case is exceptional and an award of plaintiffs' reasonable attorneys' fees and enhanced damages;

c)      For preliminary and permanent injunctions enjoining and restraining the defendants and each of their agents, employees, officers, attorneys, successors, assigns, affiliates and any persons in privity or active concert or participation with any of them from committing any further acts of infringement and requiring the dismantling of all infringing model 412 replicas;

d)      For preliminary and permanent injunctions enjoining and restraining the defendants and each of their agents, employees, officers, attorneys, successors, assigns, affiliates and any persons in privity or active concert or participation with any of them from using the trademark PERC with or without its accompanying logo, or any other designation alone or in combination with other words or symbols, as a trademark, tradename component or otherwise, to market, advertise, distribute or identify defendants' products or services;

e)    For damages against defendants for their past and continuing infringement of plaintiffs' PERC in violation of 15 U.S.C. § 1114(1);

f)    For damages against defendants for their past and continuing infringement of plaintiffs' H & M GOPHER CONTROL trademark in violation of 15 U.S.C. § 1114(1);

g)    For damages against defendants for their past and continuing acts of unfair competition and false designation of origin in violation of 15 U.S.C. § 1125(a);

h)    Permanently enjoining and restraining the defendants and each of their agents, employees, officers, attorneys, successors, assigns, affiliates and any persons in privity or active concert or participation with any of them from using the trademark PERC with or without its accompanying logo, or any other designation alone or in combination with other words or symbols, as a trademark, tradename component or otherwise, to market, advertise, distribute or identify defendants' products or services;

i)    Permanently enjoining and restraining the defendants and each of their agents, employees, officers, attorneys, successors, assigns, affiliates and any persons in privity or active concert or participation with any of them from using the tradename H & M GOPHER CONTROL with or without its accompanying logo, or any other designation alone or in combination with other words or symbols, as a trademark, tradename component or otherwise, to market, advertise, distribute or identify defendants' products or services;

j)    Directing defendants, pursuant to 15 U.S.C. § 1116(a), to file with the Court and serve on plaintiff within thirty (30) days after issuance of an injunction, a report in writing and under oath setting forth in detail the manner and form in which defendants have complied with the injunction;

k)    Requiring that defendants, Pursuant to 15 U.S.C. § 1118, and all others acting under defendants' authority, at their cost, be required to deliver up and destroy all devices, literature, advertising, labels and other material in their possession bearing the infringing designation;

l)    Awarding plaintiffs all damages they sustained as the result of defendants' acts of infringement and unfair competition, said amount to be trebled, together with prejudgment

interest, pursuant to 15 U.S.C. § 1117;

       m)    Awarding to plaintiffs all profits received by defendant from sales and revenues of any kind made as a result of its infringing actions, said amount to be trebled, after an accounting pursuant to 15 U.S.C. § 1117;

       n)    Awarding plaintiffs their attorneys' fees and costs pursuant to 15 U.S.C. § 1117, because of the exceptional nature of this case resulting from defendants' deliberate infringing actions;

       o)    Awarding damages to plaintiffs for defendants' infringement of plaintiffs' common law trademarks;

       p)    Awarding restitution to plaintiffs as a result of defendants' unfair competition pursuant to California Business & Professions Code Section 17200; and

       q)    Granting plaintiffs such other and further relief as the Court may deem just.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand trial by jury on all issues so triable.

Dated: December 15, 2017           EASTMAN & MCCARTNEY LLP

                                        _/s/ Matthew C. McCartney_
                                   Matthew C. McCartney, Esq.
                                   Attorneys for Plaintiffs , H & M Gopher
                                   Control and Allen Hurlburt

Exhibit 1

(12) **United States Patent**     (10) **Patent No.:**     **US 7,581,349 B2**
Hurlburt                          (45) **Date of Patent:**          **Sep. 1, 2009**

(54) **METHOD AND APPARATUS FOR USING PRESSURIZED EXHAUST GASES TO CONTROL RODENTS**

(75) Inventor:  **Allen Hurlburt**, 1979 County Road 106, Tulelake, CA (US) 96134

(73) Assignee:  **Allen Hurlburt**, Tulelake, CA (US)

( * ) Notice:  Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 157 days.

(21) Appl. No.: **11/692,041**

(22) Filed:  **Mar. 27, 2007**

(65)  **Prior Publication Data**

US 2007/0277428 A1    Dec. 6, 2007

**Related U.S. Application Data**

(60) Provisional application No. 60/803,692, filed on Jun. 1, 2006.

(51) **Int. Cl.**
*A01M 13/00*    (2006.01)
(52) **U.S. Cl.** ...................................................... **43/124**
(58) **Field of Classification Search** .................. 43/124, 43/125, 127, 129
See application file for complete search history.

(56)  **References Cited**

U.S. PATENT DOCUMENTS

435,860  A  *   9/1890  Russell ........................ 43/127

| | | | |
|---|---|---|---|
| 721,535 A * | 2/1903 | Boylan | 43/127 |
| 1,309,193 A * | 7/1919 | Garrison | 43/127 |
| 1,492,732 A * | 5/1924 | Knopf | 43/124 |
| 1,529,785 A * | 3/1925 | Hammond et al. | 43/125 |
| 1,722,833 A * | 7/1929 | Abby | 43/129 |
| 1,930,588 A * | 10/1933 | Dibble | 43/127 |
| 2,413,143 A | 12/1946 | Jucksch | |
| 2,467,922 A * | 4/1949 | Woytal et al. | 285/8 |
| 4,005,976 A | 2/1977 | Rombach et al. | |
| 4,026,330 A * | 5/1977 | Dunn | 138/103 |
| 4,829,706 A * | 5/1989 | Perry | 43/125 |
| 4,833,818 A | 5/1989 | Berta | |
| 5,700,039 A * | 12/1997 | Manning | 285/148.23 |
| 5,860,243 A * | 1/1999 | Stager | 43/124 |
| 6,171,098 B1 | 1/2001 | Meyer | |
| 2005/0144832 A1* | 7/2005 | Shaffer | 43/124 |
| 2006/0230671 A1* | 10/2006 | Hudson et al. | 43/124 |
| 2008/0127547 A1* | 6/2008 | Maas | 43/124 |
| 2008/0222942 A1* | 9/2008 | Dalton | 43/58 |

* cited by examiner

*Primary Examiner*—Kurt Rowan
(74) *Attorney, Agent, or Firm*—Michael A. Glenn; Glenn Patent Group

(57)  **ABSTRACT**

A method and apparatus for controlling rodents uses pressurized exhaust gases from an internal combustion engine. The gases are compressed and injected under pressure into underground burrows of rodents. The rodent tunnels fill with a very high concentration of such gases as carbon monoxide from the exhaust within just a few seconds.

**14 Claims, 9 Drawing Sheets**



Fig 1





Fig 2



Fig. 3a

Fig. 3b



Fig 4



Fig 5



Fig 6

# Fig 7





Fig 8



Fig 9



Fig 10

**1**

## METHOD AND APPARATUS FOR USING PRESSURIZED EXHAUST GASES TO CONTROL RODENTS

### CROSS REFERENCE TO RELATED APPLICATIONS

This application claims priority to U.S. provisional patent application Ser. No. 60/803,692, filed 1 Jun. 2006, which application is incorporated herein in its entirety by this reference thereto.

### BACKGROUND OF THE INVENTION

1. Technical Field

The invention relates to pest control. More particularly, the invention relates to a method and apparatus for the use of pressurized exhaust gases to control rodents.

2. Description of the Prior Art

The infestation of cultivated lands by underground rodents has plagued farmers, gardeners, and groundskeepers alike for generations. Modern agricultural practices, such as weed-free border areas, as well as the wide spread use of sprinkler irrigation, have actually increased the amount of acreage which is a preferred habitat for gophers, moles, and ground squirrels. Perennial farmed crops, such as hay, and orchards are particularly difficult to protect. Thus, farmers pay a heavy price each year in lost productivity, in addition to the cost of ineffective control measures. For example, Kansas State University estimates that pocket gophers alone are responsible for a 20 to 50 percent drop in productivity in infested alfalfa fields and grassland.

Current control measures used by agriculturists include trapping, flooding, and poison bait inserted in the natural burrow or in an artificial burrow created with a chisel tooth. Existing devices using non-pressurized exhaust gases, such as carbon monoxide, from an internal combustion engine to poison underground rodents are labor intensive and ineffective. They require operators to dig out each individual burrow entrance and they result in very low kill rates. Poisoned bait, either placed in existing burrows by hand or in artificial burrows created for this purpose, has been partially effective in the past with good management, but current regulations limiting the kind and concentration of poison in rodent baits have seriously compromised its effectiveness. In addition, the creation of an artificial burrow to apply such bait destroys a portion of the very crop it is designed to protect.

The damage done by burrowing rodents is two-fold. Both the burrows and the rodents themselves damage the root system of crops and landscaping, resulting in reduced yields. In addition, gophers and ground squirrels create mounds of dirt excavated from their tunnels. These mounds, up to two feet in diameter and eight inches high, are a serious problem for hay farmers because they can break farming machinery and contaminate the hay with dirt. For example, mechanical harvesters for fruit orchards require flat, level ground between tree rows, so as not to damage the trees. Land that is riddled with gopher mounds thus requires the farmer to perform continual land shaping for harvest operations.

### SUMMARY OF THE INVENTION

The invention comprises a method and apparatus that uses pressurized exhaust gases for controlling rodents. The exhaust gases from an internal combustion engine, for example, are compressed and injected under pressure into underground burrows of such rodents. The rodent tunnels fill with a very high concentration of such gases as carbon monoxide from the exhaust within just a few seconds. The pressurized injection of poisonous exhaust in the enclosed burrows has proven highly effective in field trials with preliminary kill rates of eighty to ninety percent.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a schematic view of a device that uses compressed exhaust gases to control rodents according to the invention;

FIG. **2** is a schematic diagram showing an exhaust supply manifold for a rodent control device according to the invention;

FIG. **3** is a schematic diagram showing cooling coils for use in connection with a device for rodent control according to the invention, in which FIG. **3**a is a side view of a cooling coil and FIG. **3**b is a top view of such a cooling coil;

FIG. **4** is a schematic diagram showing an exhaust compression intake manifold for a device for rodent control according to the invention;

FIG. **5** is a schematic diagram showing an exhaust applicator with a probe for use in connection for a rodent control device according to the invention;

FIG. **6** is a schematic diagram of an exhaust applicator with a flex hose for use with a device for rodent control according to the invention;

FIG. **7** is a schematic diagram showing the use of a rodent control device to inject exhaust into a gopher burrow according to the invention;

FIG. **8** is a schematic diagram showing the use of a rodent control device to inject exhaust into a mole burrow according to the invention;

FIG. **9** is a schematic diagram showing the use of a rodent control device to inject exhaust into a ground squirrel burrow according to the invention; and

FIG. **10** is a schematic diagram showing the operation of a rodent control device according to the invention.

### DETAILED DESCRIPTION OF A PREFERRED EMBODIMENT

The invention comprises a method and apparatus that uses pressurized exhaust gases for controlling rodents. The exhaust gases from, for example, an internal combustion engine are compressed and injected under pressure into underground burrows of such rodents. The rodent tunnels fill with a very high concentration of such gases as carbon monoxide from the exhaust within just a few seconds. The pressurized injection of poisonous exhaust in the enclosed burrows as proven highly effective in field trials with preliminary kill rates of eighty to ninety percent.

The presently preferred embodiment of the invention uses an air compressor powered by an internal combustion engine. The exhaust produced by the internal combustion engine is diverted through a free-flow weldment manifold to a set of cooling coils. Cooled exhaust is routed by the cooling coils to the compression intake manifold that is attached to the intake port of the compressor unit. The compressed exhaust is stored in a pressure tank to be used as needed. Exhaust is released out of the pressure tank through a flexible air hose and injected into the burrows to eradicate underground rodents.

The exhaust supply manifold diverts the exhaust via a weldment using a pipe T between the muffler and the exhaust port. The exhaust supply manifold has one or more adaptation ports for connection and delivery of exhaust to an appropriately sized cooling mechanism. The cooling mechanism consists of tubing sized, and run appropriately, to reduce the

**3**

temperature of exhaust passed from the exhaust supply manifold to the exhaust compression intake manifold. The exhaust compression intake manifold receives the exhaust from the cooling mechanism and transfers it through a port of equal size to the intake port of the compression device used.

The exhaust applicator is the means through which pressurized exhaust is inserted into the burrow. It receives the exhaust from the compression device through a flexible air hose. The transfer of the exhaust is controlled via a shutoff valve mounted on the exhaust applicator. Monitoring of injection pressure determines if the probe is in the burrow. Monitoring is performed with a pressure gauge that is mounted downstream of the shutoff valve. If the injector is in the burrow, the pressure registered on the pressure gauge decreases.

Depending on the kind of burrow, exhaust is inserted using either a rigid wand or a flexible tube. The probe used for closed burrows such as those of moles or ground squirrels is a small rigid tube with an enclosed end and perpendicular jets to route exhaust into the burrow. For open tunnels, this probe is replaced with flexible tubing that is inserted and sealed into open burrows.

In the presently preferred embodiment, the operator either inserts the exhaust applicator wand into the ground, intercepting the underground burrow, or inserts the flexible applicator tube into the open burrow and seals the burrow opening with dirt. The shutoff valve is then turned on to fill the burrow with a high concentration of pressurized exhaust.

FIG. **1** is a schematic diagram showing a device for rodent control that operates on compressed exhaust gases. While the source of exhaust gases in the preferred embodiment is the internal combustion engine, those skilled in the art will appreciate that other sources of gases may also be provided.

In FIG. **1**, the exhaust supply manifold **1** receives exhaust gas from the exhaust port **6** on internal combustion engine **5**. The exhaust gas passes through an exhaust pipe **7** and through the exhaust muffler **8** for venting to the atmosphere. The manifold also directs an exhaust flow through cooling coils **2** to an exhaust compression intake manifold **3** and thereafter through an intake port **9** to a compressor **10**. The compressor compresses the cooled exhaust gas and a compressed exhaust line **11** directs the exhaust gas to a compressed exhaust storage tank **12**. Pressure within the tank is indicated by a pressure gauge **13** that is coupled to the tank by a pressure regulator **14**. The gases are provided to a rodent control device via one or more quick coupling ports **15** to which a flexible air hose **16** may be connected. The air hose includes a shut off or control valve **17** at its far end which controls the flow of gas to an exhaust applicator **4**. The pressure of the gas at the exhaust applicator can be indicated by an applicator pressure gauge **18**.

FIG. **2** is a schematic diagram showing the exhaust supply manifold **1**. An exhaust flow enters the manifold through an engine exhaust port flange **21** and is conducted via an exhaust pipe **22** to an exhaust muffler **23** for venting into the atmosphere. The exhaust flow is also conducted by an inlet connecting pipe **24** to an exhaust supply manifold **26**. The exhaust pipe, interconnecting pipe, and the exhaust supply manifold in this embodiment of the invention are connected together by various welds **25**. The output of the exhaust supply manifold is provided via one or more outlet connecting pipes **27** and a pipe elbow **28** to outlet tubing **29** for connection to cooling tubes, as discussed above. Those skilled in the art will appreciate that the various connections need not be made by welds as indicated above and that the size of the pipes and angles of bends are a matter of choice as well.

**4**

FIG. **3** is a schematic diagram showing the cooling coils. FIG. **3**a is a side view of the cooling coils and FIG. **3**b provides a top view of the cooling coils. The cooling coils include a set of flanged nuts **31** at each end and are formed of copper tubing **32** in the preferred embodiment. Those skilled in the art will appreciate that the composition and arrangement of cooling coils may be changed as a matter of choice.

FIG. **4** is a schematic diagram showing an exhaust compression intake manifold **3** according to the invention. In FIG. **4**, the exhaust gas from the cooling coils is coupled by and inlet tubing **7** and a pair of 90° elbows **46** through inlet connecting pipes **45** to an exhaust compression intake manifold **44**. From the exhaust compression intake manifold, the exhaust gases are conducted via an intake port **42** to the compressor to which the exhaust compression intake manifold is coupled by an intake port flange **41**. In FIG. **4**, the intake port flange, intake port to the compressor, and the exhaust compression intake manifold are joined together by the series of welds **43**. Those skilled in the art will appreciate that other forms of attachment may be provided.

FIGS. **5** and **6** are schematic diagrams showing an exhaust applicator **4**. FIGS. **5** and **6** have in common a flexible hose **51** which receives the compressed exhaust gas. The hose is coupled to a shut off value **53** via a hose quick coupler **52**. An applicator pressure gauge **54** alerts the operator to the pressure within the system being delivered at the applicator. In the preferred embodiment, a section of steel tubing is used to direct the exhaust flow to the delivery port of the applicator. The preferred embodiment, the steel tubing is formed as a T with a further piece of tubing extending between the shut off valve **53**, and the pressure gauge **54**. The steel tubing which forms the T is connected using a weld **55** in the preferred embodiment.

FIG. **5** provides an embodiment of the invention in which a probe **57**, comprised of steel tubing, is coupled to opposing ⁵⁄₆₄" jets **58** formed therein through which the exhaust gas is delivered.

FIG. **6** shows an alternate embodiment of an invention, in which a hose clamp **69** couples the exhaust flow. The hose clamp is used to hold a flexible hose **70** to couple the exhaust flow into an animal burrow. Those skilled in the art will appreciate that the examples of FIGS. **5** and **6** are illustrative and that other forms of delivery may be provided.

FIG. **7** is a schematic diagram showing exhaust being injected into a gopher burrow according to the invention. In FIG. **7**, an applicator **4** is inserted through the ground surface **72** in the gopher burrow **73**. The gopher mound **75** is sealed with a series of plugs **74** to prevent the gas from escaping.

FIG. **8** is a schematic diagram showing the use of an applicator floor to inject gas into a mole burrow. In FIG. **8**, the applicator is inserted through the mole mound **82** and ground surface **84** in the mole burrow **83**.

FIG. **9** is a schematic diagram showing exhaust injected into a ground squirrel burrow. In FIG. **9**, the applicator **4** is terminated in the hose as discussed above in connection with FIG. **6**. The hose extends through the ground squirrel mound **93** and ground surface **94** into the ground squirrel burrow **95**. The area around the ground squirrel mound is sealed with dirt **92** packed about the burrow by the operator.

FIG. **10** is a schematic diagram showing operation of a rodent control device according to the invention. In FIG. **10**, an operator **101** places an applicator **4** into a gopher burrow **103**. Exhaust gas from the exhaust gas compressor, in accordance with FIG. **1** above for example, is routed through applicator **4** into the burrow.

According to the foregoing, the invention provides for automation and mechanization for the delivery of gas. The

US 7,581,349 B2

5

pressurization of gas involved by any means increases delivery pressure above that of the exhaust provided directly by the internal combustion engine. For example, a blower, turbo charger, or compressed air source, such as a CO2 container, may be used instead of a reciprocating pump for pressurization of the fumigant of choice. The addition or substitution of fumigant materials may be made. Thus, while carbon monoxide is presently the preferred fumigant, other types of fumigants may be used to eradicate pests in connection with the invention herein disclosed. Further, the provision of the valve to control the flow of gas and the pressure gauge to monitor the injection pressure uniquely allows a level of sophistication in control during the application of fumigant heretofore unavailable, and thus provides a more certain technique for ridding farmers of these pests.

In the case of exhausting gases directly into a burrow from an engine of low pressure where the burrow is gradually filled, the rodent has sufficient time to react to the intrusion and escape. This is true with use of other types of fumigants such as ammonia and propane mixed with oxygen. Thus, the prior art achieves poor results. By injecting the gas at much higher pressure in volume as enabled by the invention, the pest is totally immersed by the gas and has no opportunity to escape before it becomes overcome by the gas. Further, by probing the burrow in several locations at the same time, the pest is engulfed by fumigant from all directions. In the case of gas or diesel engines, restriction of the exhaust may cause excessive internal temperatures that may ruin the engine. The invention herein does not restrict the exhaust flow in any way because the provision of the exhaust manifold allows normal exhaust from the engine. Rather, the invention draws upon the stream of exhaust gas naturally leaving the engine and takes what the compressor pump demands as far as pressurization of the exhaust.

According to the invention therefore, a method and apparatus is provided for instantaneous delivery of poison gas to overcome and prevent escape of a pest. In summary therefore, it is disclosed that the injection of cooled pressurized exhaust from an internal combustion engine into a burrow of a pest is an effective method of exterminating the pest. The combination of cooling, pressurization, and storage as set forth herein uniquely provides the opportunity to deliver such exhaust gases from an internal combustion engine, where the internal combustion engine is merely a source of a gas and not the delivery mechanism itself. The higher pressure injection of exhaust fills the burrow with poisonous gases faster than a pest can react, whereas the prior art creates odor, turbulence, or atmospheric pressure changes that would otherwise alert the pest.

The use of pressurized exhaust delivery also allows for substantially higher volume of poisonous exhaust to be delivered into the burrow, resulting in measurably more effective fumigation. The pressurized storage of the exhaust creates a reservoir poisonous carbon monoxide, for example which is sufficient to fill a burrow completely and rapidly. The cooling coils reduce the temperature of the gas prior to compression, which allows for greater concentration of exhaust within the storage tank in a safe fashion. The exhaust applicator herein is an effective indirect means for pumping exhaust into pest tunnels, therefore eliminating the need to dig out a burrow to exterminate rodents.

The combination of a valve and pressure gauge with the injector probe allows the operator to find the underground burrow more accurately. When the value is turned on after injection, the pressure drops if the applicator is in the burrow. If the applicator is not in the burrow, the pressure increases.

6

Although the invention is described herein with reference to the preferred embodiment, one skilled in the art will readily appreciate that other applications may be substituted for those set forth herein without departing from the spirit and scope of the present invention. Accordingly, the invention should only be limited by the Claims included below.

The invention claimed is:

1. An apparatus for controlling rodents, comprising:

means for compressing exhaust gases from an internal combustion engine and for injecting said gases under pressure into underground burrows of said rodents;

wherein said rodent burrows quickly fill with a very high concentration of said gases;

said means for compressing and injecting further comprising:

an exhaust supply manifold for diverting a portion of exhaust gas from said internal combustion engine without restricting an exhaust flow from said engine;

wherein a stream of exhaust gas is drawn from exhaust gas leaving said engine based on demand for pressurization and delivery of said exhaust gas by said apparatus;

a free-flow manifold for receiving said diverted exhaust gas;

a set of cooling coils for receiving said exhaust gas from said manifold;

a compressor, wherein cooled exhaust gas is routed by said cooling coils to an exhaust compression intake manifold that is attached to an intake port of said compressor;

a pressure tank for storing compressed exhaust gas from said compressor;

a flexible air hose, wherein exhaust gas is controllably released out of the pressure tank through a flexible air hose; and

an exhaust applicator for injecting pressurized exhaust gas into said rodent burrows.

2. The apparatus of claim 1, said exhaust supply manifold comprising a pipe T between a muffler associated with said internal combustion engine and an exhaust port;

said exhaust supply manifold comprising one or more adaptation ports for connection and delivery of exhaust gas to said cooling coils.

3. The apparatus of claim 1, said cooling coils comprising tubing sized, and run appropriately, to reduce the temperature of exhaust gas passed from said exhaust supply manifold to said exhaust compression intake manifold.

4. The apparatus of claim 1, said exhaust compression intake manifold receiving said exhaust gas from said cooling coils and transferring said exhaust gas through a port of substantially equal size to said intake port of said compressor.

5. The apparatus of claim 1, said exhaust applicator further comprising:

means for receiving said exhaust gas from said compressor through said flexible air hose; and

a probe for inserting pressurized exhaust into said rodent burrow.

6. The apparatus of claim 1, said exhaust applicator further comprising:

a shutoff valve mounted on the exhaust applicator for controlling transfer of said exhaust gas.

7. The apparatus of claim 1, said exhaust applicator further comprising:

a pressure gauge mounted downstream of said shutoff valve for monitoring injection pressure and for determining if said probe is in said rodent burrow;

**7**

wherein if said injector is in said rodent burrow, pressure registered on said pressure gauge decreases.

**8**. The apparatus of claim **5**, said probe comprising either of:

    a rigid wand comprising a rigid tube having an enclosed end and perpendicular jets to route exhaust gas into said rodent burrow; and

    a flexible tube that is inserted and sealed into open rodent burrows.

**9**. A method for controlling rodents, comprising the steps of:

    compressing exhaust gases from an internal combustion engine; and

    injecting said gases under pressure into underground burrows of said rodents;

    wherein said rodent burrows quickly fill with a very high concentration of said gases;

    said compressing and injecting steps being performed by:

        diverting a portion of exhaust gas from said internal combustion engine with an exhaust supply manifold without restricting an exhaust flow from said engine;

        drawing a stream of exhaust gas from exhaust gas leaving said engine based on demand for pressurization and delivery of said exhaust gas;

        receiving said diverted exhaust gas at a free-flow manifold;

        receiving said exhaust gas from said manifold at a set of cooling coils;

        routing cooled exhaust gas by said cooling coils to an exhaust compression intake manifold that is attached to an intake port of a compressor;

        storing compressed exhaust gas from said compressor in a pressure tank;

**8**

        controllably releasing exhaust gas out of the pressure tank through a flexible air hose; and

        injecting pressurized exhaust gas into said rodent burrows with an exhaust applicator.

**10**. The method of claim **9**, further comprising the step of:

    an operator either inserting an exhaust applicator wand into an underground rodent burrow, or inserting a flexible applicator tube into a open rodent burrow and sealing said rodent burrow opening with dirt.

**11**. The method of claim **9**, wherein exhaust gas is injected into a gopher burrow by the steps of:

    inserting an applicator through the ground surface and into said gopher burrow; and

    sealing a gopher mound with a series of plugs to prevent said exhaust gas from escaping.

**12**. The method of claim **9**, wherein exhaust gas is injected into a mole burrow by the step of:

    inserting an applicator through a mole mound and ground surface and into said mole burrow.

**13**. The method of claim **9**, wherein exhaust gas is injected into injected into a ground squirrel burrow, by the steps of:

    terminating an applicator in a hose that extends through a ground squirrel mound and ground surface said the ground squirrel burrow; and

    sealing an area around said ground squirrel mound with dirt packed about said ground squirrel burrow.

**14**. The method of claim **9**, further comprising the step of:

    probing said rodent burrow in several locations at the same time;

    wherein a pest is engulfed by exhaust gas from all directions.

\*   \*   \*   \*   \*

Exhibit 2



# United States of America
### United States Patent and Trademark Office

# H & M GOPHER CONTROL

**Reg. No. 4,097,962**

**Registered Feb. 14, 2012**

**Int. Cl.: 11**

**TRADEMARK**

**PRINCIPAL REGISTER**

ALLEN HURLBURT (UNITED STATES INDIVIDUAL), DBA H & M GOPHER CONTROL
1979 COUNTY ROAD 106
TULELAKE, CA 96134

FOR: RODENT CONTROL EQUIPMENT, NAMELY, OUTDOOR AUTOMATED EXHAUST GAS SYSTEM FOR RODENT CONTROL COMPRISING AN ENGINE, COMPRESSOR PUMP, PRESSURE TANK, AIR HOSES, AND HAND-HELD WANDS, IN CLASS 11 (U.S. CLS. 13, 21, 23, 31 AND 34).

FIRST USE 11-1-2005; IN COMMERCE 12-0-2006.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "GOPHER CONTROL", APART FROM THE MARK AS SHOWN.

SER. NO. 85-194,897, FILED 12-10-2010.

COLLEEN DOMBROW, EXAMINING ATTORNEY



*David J. Kappos*

Director of the United States Patent and Trademark Office

Exhibit 3



# United States of America

### United States Patent and Trademark Office

# PERC

**Reg. No. 4,086,472**

**Registered Jan. 17, 2012**

HURLBURT, ALLEN W. (UNITED STATES INDIVIDUAL), DBA H & M GOPHER CONTROL
1979 COUNTY ROAD 106
TULELAKE, CA 96134

**Int. Cl.: 7**

FOR: RODENT CONTROL EQUIPMENT, NAMELY, OUTDOOR AUTOMATED EXHAUST
GAS SYSTEM FOR RODENT CONTROL COMPRISING AN ENGINE, COMPRESSOR PUMP,
PRESSURE TANK, AIR HOSES, AND HAND-HELD WANDS, IN CLASS 7 (U.S. CLS. 13, 19,
21, 23, 31, 34 AND 35).

**TRADEMARK**

**PRINCIPAL REGISTER**

FIRST USE 2-7-2007; IN COMMERCE 2-7-2007.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-
TICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 85-195,146, FILED 12-10-2010.

PAUL E. FAHRENKOPF, EXAMINING ATTORNEY



*David J. Kappos*

Director of the United States Patent and Trademark Office

Exhibit 4



Exhibit 5



Email or Phone
Password
Log In
Forgot account?

Benchmark Pest Control, Inc.
@BenchmarkPestControl

- Home
- About
- Services
- Reviews
- **Photos**
- Videos
- Posts
- Community

Create a Page

Like | Recommend | Call Now | Message

Albums Untitled Album

## Untitled Album

6 Photos · Updated 8 months ago

Perc Systems! Taking care of Gophers!

Benchmark Pest Control, Inc. likes this.

English (US) Español Français (France) 中文(简体) العربية Português (Brasil) Italiano 한국어 Deutsch हिन्दी 日本語

Sign Up Log In Messenger Facebook Lite Mobile Find Friends People Pages Places Games Locations
Celebrities Marketplace Groups Recipes Sports Look Moments Instagram About Create Ad Create Pa
Developers Careers Privacy Cookies Ad Choices Terms Help

Facebook © 2017

Exhibit 6

## EASTMAN & McCARTNEY LLP

| | Please respond to: |
|---|---|
| 401 West A Street, Suite 1785 | **MATTHEW C. McCARTNEY, Esq.** | 1430 Truxtun Avenue, Suite 700 |

401 West A Street, Suite 1785
San Diego, California 92101
Telephone (619) 230-1144
Facsimile (619) 230-1194

**MATTHEW C. McCARTNEY, Esq.**
Registered Patent Attorney

matt@eastmanmccartney.com

1430 Truxtun Avenue, Suite 700
Bakersfield, California 93301
Telephone (661) 334-1800
Facsimile (661) 334-8016

October 12, 2017

**VIA CERTIFIED U.S. MAIL**

Andrew Ozanich
Benchmark Pest Control
2028 Jason Street
Bakersfield, CA 93312

Mr. Ozanich,

This office represents H & M Gopher Control ("H & M") in the protection of its intellectual property matters.  H & M is a leader in the field of portable pressurized exhaust gas dispensers for use in the control of rodents.  H & M is the exclusive licensee of United States Patent No. 7, 581, 349 (the '349 Patent), United States Registration Number 4086472 for the trademark "PERC," and United States Registration Number 4097962 for the trademark "H & M GOPHER CONTROL."   A copy of the '349 Patent and a copy of the trademark registrations for PERC and H & M GOPHER CONTROL are attached for your review. Further, H & M owns and utilizes the following logo in connection with its business and products:



Andrew Ozanich
Benchmark Pest Control
October 12, 2017
Page 2 of 4

H & M advertises and promotes its rodent control system under the PERC and H & M GOPHER CONTROL trademarks and the H & M logo throughout the United States.  In addition, H & M has numerous valued customers for its portable pressurized exhaust gas dispensers systems bearing the trademarks and logo in Bakersfield, California.  As a result of these efforts, together with favorable patron recommendations and media reviews, H & M has developed extensive and valuable goodwill in the trademarks and the H & M logo.

H & M values its intellectual property rights and protects those rights from unauthorized use. H & M is informed that your company is in possession of a trailer manufactured by H & M that practices the invention disclosed in the '349 Patent for which you contacted my client seeking to purchase parts.  You then made and subsequently cancelled a purchase order for an H & M trailer.  Since cancelling the purchase order, H & M has learned that you have manufactured three trailers that are nearly identical to the H & M manufactured trailer and that these three trailers also practice the invention disclosed in the '349 Patent.  As shown below, pictures of these trailers are publicly and prominently displayed on the Benchmark Pest Control Facebook® page.



H & M is further informed that you are currently manufacturing three additional trailers that are also nearly identical to the H & M design.  H & M is further informed that you

hired DB & Company to make exact replicas of the H & M logo, including the H & M word mark and U.S. patent number 7, 581, 349, and that you have affixed those replica logos to the trailers that you have manufactured.  H & M is informed that you have used these above referenced trailers in connection with rodent control services offered by Benchmark Pest Control and marketed those trailers as PERC systems.  These acts constitute serious violations of the law, including patent infringement, trademark infringement, false advertising, false patent marking, false designation of origin, and federal and state unfair competition.

You do not have permission to make, use, offer to sell, or sell any product that reads on any claims of the '349 Patent.  To the extent you have copied H & M's trailer design, it is highly likely that your trailers are infringing the '349 Patent.  Remedies available to my client for your patent infringement include injunctive relief, damages, and attorney's fees. Moreover, since you have copied logos bearing patent number 7, 581, 349, it is clear that your infringement is willful thereby exposing you to an additional penalty of up to three times the compensatory damages suffered by my client.

Even if your manufactured trailers and your use of those trailers did not infringe the '349 Patent, your unauthorized use of my client's trademarks and logo on those trailers is separately actionable under federal law.  More specifically, your use of the trademarks PERC and H & M GOPHER CONTROL and the H & M logo are likely to cause consumer confusion as to sponsorship and origin of those trailers.  As a result, your continued use of the trademarks and logo constitutes trademark infringement and false designation of origin and is also unfair competition under federal and state law.

I have been authorized to initiate federal suit on behalf of H & M against you and your company and seek all monetary relief available to my client, including treble damages and attorneys' fees.  Nonetheless, my client is willing to resolve the matter without the need for suit if the following conditions are met:

1. Agree in writing by no later than October 23, 2017 that you will immediately cease and desist any and all use of the PERC and H & M GOPHER CONTROL trademarks and related logo;

2. Agree in writing by no later than October 23, 2017 that you will immediately cease and desist any activities to manufacture, sell, or use any vehicle or trailer having a pressurized exhaust gas dispenser system for use in rodent or pest control with the sole exception of units that were manufactured by H & M and lawfully purchased by you or your company;

3. For each H & M manufactured device in you or your company's possession that you contend was lawfully purchased, provide an inventory list, including

Andrew Ozanich
Benchmark Pest Control
October 12, 2017
Page 4 of 4

license number, vehicle identification number, H & M serial number and
receipt for each such trailer by no later than October 23, 2017.  You will be
able to retain all such units that H & M can verify originated from H & M;

4. Provide an inventory list, including license number and vehicle identification
number of any trailer or motor vehicle owned or operated by you or your
company that has a pressurized exhaust dispenser system by no later than
October 23, 2017.

5. Enable inspection by my client (or its authorized agent) of all trailers and
vehicles owned or operated by you or your company that utilize a pressurized
exhaust gas dispenser system by no later than October 23, 2017; and

6. Agree to dismantle all such trailers or motor vehicles identified in item (4) or
item (5) above by no later than November 6, 2017.

If you do not respond to this letter in writing or otherwise fail to agree to each of
the terms 1 through 6 above by October 23, 2017, my client's offer to resolve this
dispute without the payment of money will be withdrawn and we will initiate suit.

We look forward to your response.

Very truly yours,

Matthew C. McCartney, Esq.

MCM/
Enclosures